IN THE UNITED STATES COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


M. DIANNE MEYERS,              :         CIVIL ACTION
                    Plaintiff  :
                               :
          v.                   :
                               :
CONSHOHOCKEN CATHOLIC SCHOOL    :
and ARCHDIOCESE OF             :
PHILADELPHIA,                  :
                    Defendants :         NO. 03-4693



MEMORANDUM AND ORDER


McLaughlin, J.                          December 30, 2004

          M. Dianne Meyers alleges that Conshohocken Catholic

School ("CCS") and the Archdiocese of Philadelphia

("Archdiocese") refused to permit her to return to work after

recuperation from a disability and precluded her from seeking

future employment with other Catholic schools within the

Archdiocese in violation of the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12101 et seq., and the Pennsylvania Human

Relations Act ("PHRA"), 43 Pa. Const. Stat. Ann. § 951 et seq.

          The defendants moved for summary judgment.  The Court

held oral argument on this motion on November 2, 2004.  The Court

will grant the defendants' motion because Meyers has not

established a prima facie case of disability discrimination by

showing that she is an otherwise qualified individual under the

ADA.  Further, Meyers has not proffered sufficient evidence to defeat summary judgment by showing that the defendants' stated reason for their employment action was a pretext for discrimination.

     I.  <u>Background</u>

     The facts in the light most favorable to Meyers are as follows.[1]  Meyers worked at CCS as an elementary school teacher from September 1996 until October 2001.  Meyers also worked as director of CCS's C.A.R.E.S. program, a program supervising students before and after school.  Prior to CCS, Meyers was a teacher at St. Matthew's Parish School from 1984 to 1996.[2]  By the end of Meyers's employment with CCS, she had worked for the Archdiocese for 28 years. Pl.'s Resp. to Summ. J. ("Pl.'s Resp.") at 1-3.

---

1.  In deciding a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party.  Summary judgment is appropriate if all of the evidence demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. Pro. 56(c).  The moving party has the initial burden of demonstrating that no genuine issue of material fact exists.  Once the moving party has satisfied this requirement, the non-moving party must present evidence that there is a genuine issue of material fact.  The non-moving party may not simply rest on the pleadings, but must go beyond the pleadings in presenting evidence of a dispute of fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).

2.  CCS was formed when St. Matthew's and other schools were consolidated due to low student enrollment.  Pl.'s Resp. at 2.

Meyers suffers from two conditions on the basis of which she claims she was discriminated:  myasthenia gravis and reactive airways disease.  Meyers was first diagnosed with myasthenia gravis, a neuromuscular disease, 22 years ago.  She was first diagnosed with reactive airways disease, a form of asthma, in 2000.  Meyers Deposition ("Meyers Dep.") at 83, 175.  Both CCS and St. Matthew's hired Meyers with knowledge that she suffered from myasthenia gravis.  Id. at 156-57.

According to Meyers, the myasthenia gravis manifests itself through crisis periods that may last anywhere from a couple of days to a couple of weeks.  Id. at 197-198.  The myasthenia gravis causes difficulty breathing and a weakening of her bones and muscles.  Pl.'s Resp. at 4.  The reactive airways disease causes her to have difficulty breathing when she encounters perfume and other chemical irritants.  Meyers Dep. at 83.

During the plaintiff's tenure at St. Matthew's and CCS, she experienced symptoms from her medical conditions that caused her to take time off work.  As early as 1988, the principal of St. Matthew's school expressed concern about Meyers's ability to do her job due to her illness.  In a teacher performance evaluation, the principal stated that although Meyers had not missed an unusual number of days, she did not provide the students with the kind of education of which she was capable due

3

to her health problems.  1987-88 Evaluation, Defs' Mot. Summ. J. ("Defs.' Mot."), Ex. 7.

Meyers's health-related absences varied over the years of her employment.  The parties dispute the number of absences in some years, with the defendants citing more absences.  Where there are disputes in the record, they are resolved in favor of Meyers as the non-moving party.  According to Meyers, she was absent:  14.5 days in the 1991-92 school year; 4 days in the 1992-1993 school year; 59.5 days in the 1993-94 school year; 8.5 days in the 1994-95 school year; 10 days in the 1995-96 school year; 15 days in the 1997-98 school year; 16.5 days in the 1998-99 school year; 2.5 days in the 1999-2000 school year; and 9 days in the 2000-01 school year.[3]  Pl's Resp. at 13-17.  She went on long-term disability leave during the 1996-97 school year.

In addition to Meyers's health-related absences, she experienced symptoms of reactive airways disease, asthma, and myasthenia gravis that required her to leave work to seek immediate medical attention.  Between 1996 and 2001, the principal of CCS, Jacqueline Kerrigan ("Kerrigan"), would drive

---

3.  Meyers argues that because she has made no claims of discrimination prior to 1996 when CCS was formed, defendants' arguments regarding absences prior to 1996 should not have any bearing on the Court's determination of this motion.  Pl.'s Resp. at 12.  However, Meyers's history of attendance is relevant to the defendants' view that Meyers was unable to provide reliable and predictable attendance for her students.

Meyers to the hospital when she became ill at work.  According to
Kerrigan, she had driven Meyers to the hospital 15 to 20 times
when she became ill at work.  Kerrigan Dep. at 74.  During the
times Meyers left early to seek medical attention, Kerrigan would
find a replacement teacher to cover Meyers's class.

        Kerrigan and CCS made efforts to accommodate Meyers's
medical conditions.  After a myasthenic crisis in the 1996-97
school year, Kerrigan allowed Meyers to go on an alternative work
schedule.  In November 1996, Meyers experienced a myasthenic
crisis, causing her to miss six days from work.  Meyers Dep. at
100.  Following her return to work, Kerrigan placed Meyers on a
schedule where she would come to work three days a week for half
a day so that she could build up her strength.  The school hired
a substitute teacher to cover her class the rest of the time.
Id. at 101.[4]

        On February 4, 1997 of that same school year, Meyers
became ill again.  She spent some time in the hospital and
returned to work on February 11, 1997.  Id. at 103-04.
Thereafter, Meyers took a disability leave for the remainder of
the school year.  Id. at 113.  The school continued to provide

_____

4.  Meyers claims that she would have been able to return to work
full-time and did not need this special schedule.  Meyers Dep. at
101.  One of her doctors stated that she could return to work.
The other doctor stated that Meyers should not return to school
and that she should have more time off from work.

Meyers a salary and health insurance coverage so that she would not suffer a financial hardship while she awaited a decision about her disability benefits claim.  Id. at 114; Kerrigan Dep. at 129-30.

Meyers claims that she took the disability leave at Kerrigan's insistence so that she would not lose her job.  Meyers Dep. at 113.  Meyers did not believe the disability leave was necessary because one of her doctors stated that she could return to work.  However, another one of her doctors disagreed, stating that Meyers was unable "to sustain physical work (even standing) for more than a few minutes" and that she should return to work no sooner than September 1997.  Meyers Dep., Ex. 15.  Meyers did not return to work until September 1997.

Meyers's medical conditions impacted other aspects of her job.  Due to her reactive airways disease, Meyers did not attend some school-related activities and events where teachers who wore perfume would be present.  Meyers did not attend daily faculty meetings, annual faculty retreats, district meetings, and monthly mass in order to avoid having an asthma attack.  Meyers Dep. at 85-95.  Kerrigan never required Meyers to engage in an activity that could lead to an asthma attack, even though the activities were a part of her teaching responsibilities.  Id. at 87, 91; Pl.'s Resp. at 6-7.  Kerrigan also asked faculty members

to stop wearing strong perfume, explaining that Meyers could not be around the perfume.  Meyers Dep. at 83-84.

The events leading up to Meyers's termination of employment with CCS followed a myasthenic crisis in the beginning of the 2001-02 school year.  On September 4, 2001, one day before the new school year began, Meyers became ill.  She was hospitalized on that day and released three days later to begin recuperating.  Id. at 15.

After consulting with her doctor, Meyers called Kerrigan to inform her that she would be able to return to work on September 17, 2001.  Before allowing Meyers to return to work, Kerrigan informed her that she would need a doctor's certification stating that she could "assume all of the encompassing duties of a second grade elementary school teacher and that [she is] able to move freely throughout the classroom and school attending to those duties."  Defs' Mot., Ex. 4. Meyers's doctor sent a letter stating that while Meyers could return to work without limitation of movement in the classroom, her future clinical status was unclear, as her disease could return at any time without clear warning.  Id.  Another one of Meyers's doctors sent a letter stating that Meyers had suffered an acute exacerbation of myasthenia gravis that could occur without warning, lasting anywhere from one to several days.  Id.

On September 18, 2001, Meyers called Kerrigan again to inquire about when she could return to work.  Kerrigan responded that the doctors' letters did not answer the school's question regarding her ability to work, and that she needed to talk to the pastors, who are in charge of running the school.  <u>See</u> Gasper Genuardi Dep. at 6.  Kerrigan and the pastors scheduled a meeting with Meyers for September 26, 2001.

Meyers met with Kerrigan and the pastors on September 26, 2001 to discuss her ability to provide regular attendance. Kerrigan and the pastors asked Meyers whether she could promise to provide "consistency and continuity" in coming to work every day.  Meyers responded that she could not, acknowledging the unpredictable nature of her disease.  Meyers Dep. at 29.

After Meyers responded that she could not provide consistency and continuity, Kerrigan and the pastors discussed with Meyers possible employment alternatives within the school. The options included offering Meyers a full-time substitute position in addition to her position as director of the C.A.R.E.S. program and hiring a permanent teacher's aide for the classroom.  <u>Id.</u> at 39.  Meyers did not agree to these options because she felt was that she was capable of working in her current position.  <u>Id.</u> at 36, 39.

On October 4, 2001, Meyers had another discussion with Kerrigan regarding her return to work.  During this discussion,

Meyers stated that Kerrigan told her that if she were to come back to school, she was to do nothing but teach.  Id. at 43-44. Kerrigan asked Meyers whether she would return to work, and Meyers informed her that she would let Kerrigan know the next day.

The next day, Meyers called Kerrigan to inform her that she would be returning to work.  Id. at 45.  According to Meyers, Kerrigan said that she could return to work, but that she did not believe it was in the best interests of the school and she would not support her in the school.  Id. at 45-47.  At the end of the discussion, Meyers informed Kerrigan that the school would have to fire her because she would not quit.  Id. at 47.

On October 12, 2001, Kerrigan called Meyers to schedule a meeting for October 16, 2001 to discuss a separation agreement with the school.  Id. at 50.  At the meeting, the school presented Meyers with a separation agreement, which would provide health insurance and severance pay in exchange for a release of all claims.  Meyers said that she did not sign the agreement because it included a clause that would prohibit her from working in the Archdiocese again.  Id. at 52.  The defendants later removed the language in the separation agreement precluding Meyers from future employment within the Archdiocese.

On October 17, 2001, Meyers called the director of Elementary Personnel for the Archdiocese, Mary Rochford.  During

the conversation, she informed Ms. Rochford that the school asked her to sign a separation agreement and sought assistance in dealing with the issue.  Ms. Rochford allegedly replied that there was nothing that she could do and that as far as she was concerned, Meyers would never teach in the Archdiocese again. Id. at 58-59.

Meyers alleges discriminatory treatment based on her myasthenia gravis and reactive airways disease.  In Count I of the complaint, Meyers alleges that the defendants' refusal to permit her to return to work following her myasthenic crisis in 2001 and the defendants' refusal to reasonably accommodate her perceived impairments violated the ADA.  In Count II of the complaint, under the PHRA, Meyers alleges that CCS terminated her employment and the Archdiocese has restricted and will continue to restrict her future employment within the Archdiocese.

In their motion for summary judgment, the defendants argue that Meyers is not protected under the ADA and the PHRA. They argue that Meyers has failed to establish a prima facie case of discrimination by presenting evidence that she is an otherwise qualified individual with a disability.  The defendants argue that Meyers cannot establish a disability by showing that she was substantially limited in a major life activity.  Further, they argue that she was unable to perform the essential functions of her job with or without reasonable accommodations.  Even if

10

Meyers is protected under the ADA and the PHRA, the defendants argue that she is unable to rebut their legitimate, nondiscriminatory reason for their employment action:  concern about the lack of consistency and continuity for children in her class.

II.  <u>Discussion</u>

_____The decision whether to grant or deny summary judgment in a disability discrimination action under the ADA is governed by the Supreme Court's burden-shifting analysis in <u>McDonnell-Douglas v. Green</u>, 411 U.S. 792 (1973).  Under this analysis, the plaintiff must first make out a prima facie case of discrimination.  If the plaintiff does so, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action.  <u>Walton v. Mental Health Association of Southeastern Pennsylvania</u>, 168 F.3d 661, 668 (3d Cir. 1999);  <u>Shaner v. Synthes</u>, 204 F.3d 494, 500 (3d Cir. 2000).  In order to defeat summary judgment, the plaintiff has to point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the defendant's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.  <u>Walton</u>, 168 F.3d at 668.

A.   Prima Facie Case

In order to establish a prima facie case of discrimination under the ADA[5], the plaintiff must show that: (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she has suffered an adverse employment action as a result of the discrimination.  Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999); Shaner, 204 F.3d at 500.  The defendants argue that Meyers has not established a prima facie case of discrimination because she is not disabled and not otherwise qualified.  The defendants do not dispute and the Court will assume that Meyers suffered an adverse employment action.

1.   Disability

The ADA defines a disability as either: (A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.

---

5.  The Third Circuit has held that the same analysis applies when discussing the PHRA and the ADA.  Williams v. Philadelphia Housing Authority Police Dep't, 380 F.3d 751, 761 n.6 (3d Cir. 2004); Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999); Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).  Thus, it is only necessary to discuss the plaintiff's ADA claims.

42 U.S.C. § 12102(2).  Meyers argues that she is disabled because she has an impairment that substantially limits a major life activity and the defendants regarded her as having such an impairment.  Pl.'s Resp. at 33, 46.  Because the Court finds that the plaintiff has produced sufficient evidence to establish a physical impairment that substantially limits a major life activity, the Court will not consider whether there is also sufficient evidence to establish that the defendants regarded her as having such an impairment.

The plaintiff claims that she suffers from myasthenia gravis and reactive airways disease.  The defendants do not dispute that these are impairments for purposes of the ADA.  The contested issue is whether Meyers's impairments substantially limit a major life activity.

The EEOC regulations provide that an individual is substantially limited in a major life activity if she is unable to perform a major life activity that the average person in the general population can perform or is significantly restricted as to the condition, manner, or duration of performing the major life activity as compared to the average person in the general population.  29 C.F.R. §§ 1630.2(j)(1)(i) and (ii).

Major life activities are "those basic activities that the average person in the general population can perform with little or no difficulty."  Marinelli v. City of Erie, Pa., 216

13

F.3d 354, 361 (3d Cir. 2000).  The EEOC regulations provide that
examples of major life activities include "caring for oneself,
performing manual tasks, walking, seeing, hearing, speaking,
breathing, and working."  Id.

        Meyers asserts that she is substantially limited in her
ability to breathe, speak, see, walk, climb and descend stairs,
and swallow.  The defendants do not argue that these are not
major life activities under the ADA.  They argue that Meyers has
not established that as a result of her impairments, she is
substantially limited in her ability to engage in these
activities.  After a close review of the record evidence, the
Court agrees with the defendants on all Meyers's activities
except her breathing.

        Meyers, as the ADA plaintiff, "bears the burden of
establishing that [she] is disabled within the meaning of the
ADA," and she must affirmatively point to evidence in the record
that establishes that she is substantially limited in a major
life activity in order to survive a motion for summary judgment.
See Marinelli, 216 F.3d at 363.  In support of her argument that
she is substantially limited in the major life activities
described above, Meyers points primarily to three sources of
evidence:  her deposition testimony, records from her treating
physicians, and her affidavit.

14

Most of Meyers's breathing difficulties result from her
reactive airways disease.  When she is around perfume, strong
cleaning products, or smoke, she has an asthma attack.  Meyers
Dep. at 75.  Meyers described her physical symptoms when she has
an asthma attack:

> My throat closes up....I develop what is called a
> stridor and it's an ungodly noise that you make when
> you breathe and it's like you're grasping for air, that
> you can't get enough in, you can get it out but you
> can't get the air in....And at times I have stopped
> breathing.

Id. at 75-76.

Meyers's physician documented the impact that an asthma
attack can have on her breathing.  According to her doctor:

> When an exacerbation occurs, Meyers has an acute
> difficulty breathing, thus impacting her ability to
> perform most other functions...until the condition
> passes.  This can last up to several days....
> [E]xacerbations are caused by specific inhalants.  I
> have asked Meyers to always try to strictly avoid
> exposure to inhalants such as perfumes, dust, etc.

Request for Medical Verification, Pl.'s Resp., Ex. 19.

Meyers also experiences difficulty in breathing as a
result of her myasthenia gravis.  Meyers testified that an asthma
attack and myasthenia gravis are difficult to distinguish because
myasthenia gravis causes her to experience some of the same
symptoms.  An asthma attack may also trigger symptoms of
myasthenia gravis.  Meyers Dep. at 88-89.

15

Meyers takes measures to minimize the frequency and severity of her breathing difficulties.  In her deposition, she stated that she is able to prevent asthma attacks from happening and end asthma attacks by removing herself from settings where triggers are present.  For example, she has left stores and restaurants a number of times after she has begun to have breathing difficulties.  Id. at 75-76.  She can usually avoid a more severe reaction by using an inhaler or an Epipen.  Pl.'s Resp. at 6.

The defendants do not dispute Meyers's limitations in breathing during an asthma attack or a myasthenic crisis.  They argue that the temporary and sporadic nature of these breathing difficulties, coupled with Meyers's ability to avoid asthma attack triggers, demonstrates that Meyers does not have a substantial limitation in breathing.

Although temporary and non-chronic impairments of short duration are not covered by the ADA, an ADA plaintiff need not experience symptoms of an impairment every day to establish that an impairment is substantially limiting.  See Rinehimer v. Cemcolift, Inc. 292 F.3d 375, 380 (3d Cir. 2002); Taylor, 184 F.3d at 309.  In finding that the plaintiff was disabled in Taylor, the Court of Appeals considered the EEOC factors for determining whether an impairment substantially limits a major life activity:  (1) the nature and severity of the impairment;

16

(2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact of or resulting from the impairment.  See Taylor, 184 F.3d at 309; 29 C.F.R. § 1630.2(j)(2).

The Court will consider how each of these factors applies here.  First, the nature and severity of Meyers's conditions are such that Meyers has been hospitalized on numerous occasions.  She must always avoid exposure to common fumes or run the risk of having an asthma attack, which can trigger a myasthenic crisis.  Meyers has had to leave stores and restaurants a number of times because of difficulty breathing.  Meyers Dep. at 75-76.  After suffering an asthma attack at a faculty retreat, Kerrigan had to rush Meyers to the nearest hospital for medical treatment.  Id. at 88.  When Meyers has not been able to prevent an asthma attack, her symptoms have been so severe that she has stopped breathing entirely.  Id.  The nature and severity of her impairments weigh in favor of finding a substantial limitation.

Second, the duration of the impairments varied.  If Meyers suffered a myasthenic crisis or an asthma attack, she could be impaired for one to several days.  These impairments lasted long enough for Meyers to miss time from work and seek medical attention on some occasions.

17

Third, Meyers's impairments and attendant symptoms are likely to be permanent and long-term. There is no medical indication that her conditions will improve over time. The myasthenia gravis, which Meyers has had for over 20 years, is an unpredictable condition that occurs without much warning. She is likely to experience asthma attacks as long as she encounters exposure to chemical irritants.

The Court concludes that there is sufficient evidence in the record for which a jury could conclude that Meyers is substantially limited in the major life activity of breathing.

The Court concludes that there is insufficient evidence in the record to establish that Meyers is substantially limited in any of the other major life activities.

• Meyers is not substantially limited in speaking. In her deposition, she stated that if she talks continuously or all day long, her voice will start to get hoarse so that it sounds like she has a cold. Meyers Dep. at 73. The fact that her voice may become hoarse after speaking all day does not establish a substantial limitation, rendering her significantly less able to speak than an average person. See, e.g., Crawley v. Runyon, 1998 WL 355529, *6-*7 (E.D. Pa. June 30, 1998)(finding that the plaintiff's impairment, which caused moderate to severe hoarseness that at times affected both the quality and the volume

of his speech, did not substantially limit the plaintiff's ability to talk.[6]).

- Meyers is not substantially limited in seeing. She testified that if she does extensive reading, her eyelids start to droop. She stated, however, "There's nothing wrong with my vision, but my eyelids will droop." Meyers Dep. at 73. The Court finds that this does not constitute a substantial limitation.

- Meyers is not substantially limited in walking or climbing and descending stairs. She testified that she cannot run and it is hard for her to manage steps. Id. at 79. But she also stated that she had no problems walking or standing for long periods of time. Id. at 86-87. See Kelly v. Drexel Univ., 94 F.3d 102 (3d Cir. 1996)(finding a plaintiff, who had trouble climbing stairs, requiring him to move slowly and hold the handrail, was not substantially limited in the major life activity of walking).

- Meyers is not substantially limited in swallowing or eating. The plaintiff's affidavit states that when she eats something that requires strenuous chewing, like steak, her throat

---

6. The plaintiff brought claims under the Rehabilitation Act. The substantive standards for determining liability are the same under both the Rehabilitation Act and the Americans with Disabilities Act. See McDonald v. Commonwealth of Pa., Dept. Of Public Welfare, Polk Center, 62 F.3d 92, 95 (3d Cir. 1995).

muscles become tired and she has to wait to swallow her food. Meyers Affidavit, Pl.'s Resp., Ex. 6.  The plaintiff's inability to eat certain foods does not constitute a substantial limitation in eating.

## 2.  Otherwise Qualified Individual

The second element of the prima facie case that Meyers must establish is that she is otherwise qualified to perform the essential functions of her job, with or without reasonable accommodations by her employer.  42 U.S.C. § 12111(8).  The defendants argue that Meyers is not otherwise qualified because she could not perform the following essential functions of her job: (1) providing regular and reliable attendance in her classroom duties; and (2) attending mandatory teaching events, such as daily faculty meetings, district meetings, monthly mass, and other religious activities.

Meyers concedes that she could not attend various teaching events, but argues that attendance at such events is not an essential function of her job.  Meyers concedes that attendance at work can be an essential function of a job, but argues that she can fulfill that requirement with the reasonable accommodations that the Archdiocese and CCS have been giving her for years.  Because the Court will conclude that Meyers's

inability to provide regular attendance at work renders her otherwise unqualified, the Court need not reach the issue as to whether attendance at the various teaching events is an essential function of her job.

An employee who does not come to work on a regular basis is not "qualified" under the ADA. Smith v. Davis, 248 F.3d 249, 251 (3d Cir. 2001). In Smith, the Third Circuit cited with approval Tyndall v. National Education Centers, 31 F.3d 209, 213 (4th Cir. 1994), the facts of which are similar to this case. In Tyndall, a part-time instructor who had lupus began to miss work with increasing frequency. Id. at 211. As in this case, she also missed the beginning of an instructional cycle, which the court described as "a crucial time" for the school's operations. Id. The court held that the plaintiff was not otherwise qualified because the absences rendered the plaintiff unable to perform the essential functions of her job even with reasonable accommodations for her disability.

The record in this case demonstrates that Meyers has not been able to provide regular and reliable attendance throughout her employment with CCS. From 1996 until 2001, Meyers consistently experienced health-related absences. During at least two school years, Meyers could not meet the school's annual attendance requirements. Pl.'s Resp. at 15-16. In the fall of 2001, Meyers suffered a myasthenic crisis, causing her to miss

the beginning of the new school year.  In addition to Meyers's
sometimes lengthy absences, Meyers's absences were unpredictable.
The onset of a myasthenic crisis at times happened while Meyers
was at school, causing her to seek immediate medical attention.
At the time of her termination from CCS, neither Meyers nor her
doctors could provide the defendants with any indication that she
would be able to work regularly due to the unpredictable course
of her illness.  Meyers Dep. at 198.

        For many years, the school went to extraordinary levels
to accommodate Meyers's needs.  Some of the school's
accommodations included:  permitting Meyers to take absences
whenever she became ill for as long as she needed; excusing her
from attending daily faculty meetings, monthly mass, annual
faculty retreats, district meetings, and other required teaching
duties so that she could avoid potential triggers of an asthma
attack; finding teachers to replace her when she became ill or
when she did not attend school activities with her students;
permitting her to leave work early when she became ill and
rushing her to the hospital; allowing her to work on a reduced
work schedule; and allowing her to take a long-term disability.
Meyers agrees that up until the time of termination, the school
provided all the accommodations that she requested.  Oral
Argument Transcript at 21.

Meyers argues that the school should continue to provide her with these accommodations indefinitely.  The plaintiff is making a quasi-estoppel argument that because the Archdiocese has allowed her to take off whatever time she wanted whenever she wanted, they must continue to do so.  The Court cannot accept this argument.  The Third Circuit has found that when an employer has exceeded the ADA's requirement of reasonable accommodation, its decision to discontinue the accommodation does not give the plaintiff a cause of action against it.  See Walton, 168 F.3d at 671 (finding that unpaid leave, which the employer granted in the past, was beyond the scope of the ADA).

The defendants' past accommodations to Meyers's illnesses were beyond the scope of the ADA's requirements.  The defendants were not required to accommodate Meyers's illnesses by allowing her to miss work whenever and for however long she was ill.  Regular attendance was an essential function of Meyers's job and could only be performed when Meyers was in the classroom with her students.  Any accommodation that excused Meyers from this requirement was unnecessary under the ADA, as an employer need not eliminate the essential functions of a position in order to accommodate an employee's disability.  See, e.g., Shannon v. New York City Transit Authority, 332 F.3d 95, 100 (2d Cir. 2003); Mason v. Avaya Communications, Inc., 357 F.3d 1114, 1124 (10th

23

Cir. 2004).  An employer's policies that exceed the requirements of the ADA do not set the standard of reasonable accommodation nor do they demonstrate that an employer has conceded the reasonableness of such accommodations.  See Holbrook v. Alpharetta, 112 F.3d 1522, 1528 December 29, 2004(11th Cir. 1997); Vande Zande v. Wisconsin Dept. Of Admin., 44 F.3d 538, 545 (7th Cir. 1995).  Because allowing Meyers to miss work whenever she became ill was not reasonable, the defendants were not required to continue this accommodation.

If the Court imposed this requirement, the incentive for an employer to go beyond even what is required by the ADA would be diminished.  We want to encourage schools to try to go beyond what even is reasonable to accommodate their teachers. But when they finally conclude after years of accommodating someone, they cannot continue, they ought not be estopped from arguing that it is not reasonable to require the continuance of extraordinary measures to allow a teacher to continue teaching. The Archdiocese and CCS have gone beyond what is reasonable here.

The Court, of course, is sympathetic to Meyers, who suffers from these physical ailments.  But to demand that the school continue to employ her when her doctors cannot predict the course of her illness and give the school any understanding of

24

how many days she will be out or, more important for scheduling
purposes, when she will be out, is unreasonable.


      B.  <u>Pretext Analysis</u>

      If the plaintiff establishes a prima facie case, the
burden of production shifts to the employer to articulate some
legitimate, nondiscriminatory reason for the adverse employment
action.  <u>See</u> <u>Walton</u>, 168 F.3d at 668.  The defendants argue that
the school was concerned about the lack of consistency and
continuity for the children in her class.  In order to defeat
summary judgment, the plaintiff has to point to some evidence
that the defendants' proffered reason for the employment action
was pretextual.  In arguing that the defendants' reasons are
pretextual, Meyers points to the following evidence:  the
defendants never questioned her teaching ability; her students
never suffered academically or otherwise; the school hired
replacement teachers in 1997 when she was capable of teaching her
own class; and she had used less sick days than the school allots
to teachers at the time of her termination.

      Even if the defendants never questioned Meyers's
ability to teach, Meyers was still unable to perform an essential
function of her job by providing regular attendance.  Presenting
evidence of the quality of her teaching would not cause a

reasonable fact finder to disbelieve that the school was concerned about consistency and continuity for the students. In addition to having the requisite teaching skills, it is at least as important for a teacher to be able to demonstrate these skills by coming to work on a regular and predictable basis, especially at the beginning of a new school year. It would have been unreasonable for the defendants to allow the pattern to continue until students began to suffer academically or otherwise.

The fact that the school hired substitute teachers when Meyers claims that she was available to teach does not show that the school was not concerned about consistency and continuity for her students. First, the record shows that at least one of Meyers's doctors believed that she was unable to return to work the year that she was on long-term disability following her myasthenic crisis. Second, pointing to a single occurrence in 1997 does not cast doubt on the defendants' stated reason for their employment action four years later.

Finally, Meyers argues that the defendants' reason is pretextual because she would not have exceeded her allotted number of sick days if the defendants allowed her to return to work. Pl.'s Resp. at 49-50. This argument fails to take into consideration a continuous pattern of irregular and unpredictable attendance. Meyers had worked for CCS since 1996 and since that

26

time she had been absent each year for health-related illnesses and exceeded the sick leave allowance twice already.

Even assuming that Meyers would have only been absent the first 8.5 days of the school year, it is doubtful that she would have been able to meet the attendance requirements for the rest of the year especially in light of the letters Meyers's doctors sent to the school.  It was reasonable for the defendants to take into account her history of attendance when making a determination that she could not provide consistency and continuity for her students.

The Court finds that Meyers has not established sufficient evidence that the defendants' reason for the employment action was pretextual.  There is no reason to suspect that the defendants discriminated against Meyers's illness or sought to avoid reasonable accommodations.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

M. DIANNE MEYERS,            :    CIVIL ACTION
            Plaintiff       :
                             :
        v.                   :
                             :
CONSHOHOCKEN CATHOLIC SCHOOL  :
and ARCHDIOCESE OF           :
PHILADELPHIA,                :
            Defendants       :    NO. 03-4693

_____ORDER

AND NOW, this 30th day of December, 2004, upon consideration
of the defendants' Motion for Summary Judgment (Docket No. 15),
the plaintiff's response, the defendants' reply brief, and after
oral argument held on November 2, 2004, IT IS HEREBY ORDERED that
the motion is GRANTED for the reasons set forth in a memorandum
of today's date.  Judgment is hereby ordered for the defendants
and against the plaintiff.


                        BY THE COURT:



                        /s/ Mary A. McLaughlin
                        MARY A. McLAUGHLIN, J.